**GILMOUR PROPERTIES**

v.

**BOARD OF ASSESSMENT APPEALS OF SOMERSET COUNTY, Pennsylvania with County of Somerset and Borough of Somerset, and Somerset Area School District.**

**Appeal of: Board of Assessment Appeals of Somerset County, Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2005.

Decided April 28, 2005.

Daniel W. Rullo, Somerset, for appellant, Board of Assessment Appeals of Somerset County.

Matthew R. Zatko, Somerset, for appellee, Gilmour Properties.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

The Board of Assessment Appeals of Somerset County (Board) appeals from the June 21, 2004 order of the Court of Common Pleas of Somerset County (trial court) that granted the assessment appeal of Gilmour Properties and remanded the matter to the Board with instructions that it reduce the assessed value of the subject property to $27,000, effective tax year 2001. We affirm.[1]

Brothers Craig and Kim Bittner are the principal partners of Gilmour Properties (Landowner). In 1998, Landowner purchased a cluster of properties from the Estate of Romaine Gilmour. At issue in the present appeal is a 2.288 parcel of land situated in Somerset Borough. It is the first parcel off the Somerset Exit of the Pennsylvania Turnpike and has access to and frontage along the road leading to the Turnpike. The property is zoned "C–1, General Commercial" and has access to all public utilities. In its current state, the property is wetlands.[2]

---

[1] Our review of a tax assessment case is limited to determining whether the trial court abused its discretion, committed an error of law or rendered a decision unsupported by the evidence. *Willow Valley Manor, Inc. v. Lancaster County Bd. of Assessment Appeals,* 810 A.2d 720 (Pa.Cmwlth.2002), *appeal denied,* 572 Pa. 769, 819 A.2d 549 (2003). The trial court's findings are entitled to great deference, and its decision will not be disturbed absent clear error. *Id.*

[2] The trial court described the property as follows:

[m]ostly level and low lying. The property is crossed by an unnamed tributary of Coxes Creek. Approximately 2.08 acres of the subject [parcel] is designated as wetlands. The remaining .02 acre is essentially stream channel [that] obviously could [not] be developed .... [t]he entire property is essentially wetlands.... The property includes utility easements for water and sewer lines, and overhead electric lines.... It appears from the map that the subject property DOES lie in a flood plain.

On September 7, 2000, Landowner filed an assessment appeal because the property was assessed at $198,715, reflecting a market value of $397,430. Upon Landowner's appeal, the Board reduced the assessed value to $125,000 which equates to a fair market value of $250,000.

Landowner appealed to the trial court, which held a hearing on the appeal on December 13, 2003.[3] Without objection, the Board introduced into evidence the assessment card detailing the property's assessment history and identifying its current fair market value of $250,000 and assessed value of $125,000. The admission into evidence of the assessment records establishes a prima facie case for establishing the validity of the assessed value of the property. *Gitney v. Berks County Bd. of Assessment Appeals*, 160 Pa.Cmwlth. 647, 635 A.2d 737 (1993). When a prima facie case is established, the taxpayer then has the burden of coming forward with competent, relevant evidence to rebut the validity of the assessment. *Id.* Consequently, the burden of proof then shifted to Landowner.

Landowner presented the testimony of Robert Boyer, a licensed real estate appraiser and broker. Boyer described the appraisal process whereby he identified the property and its physical characteristics and then determined its highest and best use.[4] He concluded that the property's highest and best use is wetlands, inasmuch as the property is designated as such, has a stream channel running through it and is located in a flood zone.[5] Once he determined that the property's highest and best use was wetlands, he considered the various methods of valuing property: the income approach, the cost approach, and the sales comparison approach.

Trial court opinion dated June 21, 2004, pp. 2–3 (footnote omitted).

3. In tax assessment cases, it is the duty of the trial court to: (1) determine the property's current market value on the basis of competent, credible and relevant evidence, (2) determine the current ratio of the assessed to market value in the county and (3) direct the application of that ratio to the fair market value found by the court. *County of Monroe v. Bolus*, 149 Pa.Cmwlth. 458, 613 A.2d 178 (Pa.Cmwlth.1992)(*Bolus I* ). The function of the trial judge in a tax assessment case is not to independently value the property but to weigh the conflicting testimony and values expressed by the competing experts and arrive at a valuation based on the credibility of their opinions. *Id.* The finding of value by the trial court must be supported by competent evidence. *Id.*

4. For tax assessment purposes, real estate must be valued at its actual value. Section 402 of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402; *ENF Family P'ship v. Erie County Bd. of Assessment Appeals*, 861 A.2d 438 (Pa.Cmwlth.2004). The term "actual value" is defined as fair market value or, "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obligated to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Id.* at 440 n. 4 (quoting *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals*, 530 Pa. 451, 457, 610 A.2d 1, 3 (1992)).

5. In determining the property's highest and best use, Boyer stated that he considered the legal limitations of the property (*e.g.* zoning), the limitations of the property itself, (*e.g.* utility easements, stream channels, flood zones, wetlands) and the logical uses for the property. Because of utility easements and the unnamed tributary, Boyer stated that perhaps the actual acreage available for development would be less than 2.288 acres. Boyer further considered that this particular parcel of land is the *last* parcel along the Turnpike Exit designated as wetlands. For this reason, he opined that the Department of Environmental Protection (DEP) and the Army Corps of Engineers may withhold the required permits. Because the wetland area comprises more than one acre, a joint application is made to the DEP and the Army Corps of Engineers. (R.R. 114a)

Boyer discounted the cost approach, which values the raw land and any improvements thereon, due to the fact that there are no improvements on the property. He similarly disregarded the income approach, which values the projected income or earning power of the property, because in its present state, the land has no income-producing capabilities. He did not consider any income that could be earned by allowing the property to be used as advertising space or by allowing communication towers to be erected thereon.

Using the sales comparison approach, Boyer noted that there were no comparable sales of properties located in the flood plain and/or that were designated as wetlands located in a high commercial visibility area. Disregarding the present condition of the property, Boyer determined the fair market value of the property to be $900,000. To then account for the property's wetland condition, Boyer compared the sale of wetland properties to the sale of non-wetland properties in similar markets. From his comparisons, Boyer determined that the purchase price of wetland properties was approximately 6% of the purchase price of non-wetland properties in the same areas. Accordingly, Boyer discounted the fair market value of the property by 94% and concluded the fair market value of the subject property to be $54,000 ($900,000 × .06 = $54,000). On cross-examination, Boyer acknowledged that he did not consider the cost or effect of mitigation[6] of the property in his appraisal.

Landowner further presented the testimony of Sean Isgan, an engineer, who was engaged by Landowner to prepare the wetland encroachment permit submitted to the DEP and the Army Corps of Engineers. The application for an encroachment permit must address such issues as the location and description of the property, the topography of it, the extent of wetlands and streams that may exist on the property, and the intended use of the property. (R.R. 114a) Several plans must be included with the application to address erosion limitations, along with a site development plan and supplemental plans for any other permits that may be necessary to develop the property. (R.R. 115a)

As of the date of the trial court's hearing and of oral argument before this Court, the DEP and the Army Corps of Engineers have not accepted Landowner's proffered justification for mitigation of the property and development thereon. Landowner is thus engaged in the process of offering alternate, more environmentally beneficial locations for wetland development and developing a plan where the entire 2.288 acres is not used. In Isgan's opinion, approximately 1.56 acres is suitable for development.[7]

Isgan would not speculate as to whether the DEP and the Army Corps of Engineers would issue the necessary permits. He did suggest, however, that if the permits should be issued, it would cost approximately $200,000 to mitigate the property.

6. Mitigation would include land acquisition so as to construct new wetlands elsewhere, the costs of soil removal, structural fill, wetland construction, a wetland plan, and wetland monitoring. Generally, an acre per acre construction is required; however, the DEP has at times required a landowner to construct up to four acres of new wetlands per acre of displaced wetlands. (R.R. 123a; 145a) A landowner is responsible for the new wetlands for a period of five years after its completion. (R.R. 126a; 145a)

7. Isgan testified that approximately two-tenths of the land is on the other side of Coxes Creek and that Landowner does not intend to enclose the creek because it might not be feasible and it would require a very large enclosure. (R.R. 116a)

The Board called Craig Bittner as an adverse witness. He testified that the property is currently listed for sale in the range of $550,000 to $600,000 and that there is interest in the property if it is mitigated. At the time of his testimony, there was an offer on the property of $400,000 in a mitigated state; Landowner made a counteroffer of $600,000 given its estimate of the cost to mitigate. All offers have been made with the contingency that the property be mitigated. Bittner stated that he would not sell the property for $54,000, but would rather hold it on speculation.

The Board next presented the testimony of Robert Deison, a licensed geologist who works for an environmental consulting firm. Deison reviewed the limiting factors of the property, including the unnamed tributary and the flood plains. In view of his experience, he would attempt to justify the mitigation of the wetlands on the basis of the unique economic value of the property. Depending on the total acreage affected, the costs associated with mitigation would vary. Deison stated that in his opinion, the DEP will approve the requested permits based on the reputation of Isgan and the potential for economic development of this unique property.

Finally, the Board presented the testimony of John Riley, Somerset County's chief assessor. He stated that he appraised the property at its highest and best use as a commercial development, noting that the property is in the highest traffic area in the County. Riley clarified that he did not participate in the Board's decision to reduce the fair market value of the property from $397,430 to $250,000.

Based on the proffered testimony, the trial court determined the fair market value of the property to be $54,000. Because Somerset County assesses property at half its fair market value, the court remanded the matter to the Board with instructions that the property be assessed at $27,000 beginning tax year 2001. This appeal followed.

Both parties cite to the same case law in support of their respective positions: *Air Prods. & Chems., Inc. v. Bd. of Assessment Appeals of Lehigh County*, 720 A.2d 790 (Pa.Cmwlth.1998), *Krygier v. Monroe County Bd. of Assessment Appeals*, 668 A.2d 239 (Pa.Cmwlth.1995), and *Bolus v. County of Monroe*, 168 Pa.Cmwlth. 459, 650 A.2d 1188 (1994)(*Bolus II* ).

In *Bolus I and II,* Bolus purchased 7.64 acres of land, four of which had previously been designated as wetlands by the Army Corps of Engineers. Accordingly, the Army Corps of Engineers informed Bolus that he had to cease development of the wetland portion. Bolus then applied for a wetland crossing permit, which would allow him access to the 3.64 acres of land not designated as wetlands.

Thereafter, Monroe County conducted a reassessment and assessed the land at $88,750. Bolus appealed, and the tax assessment board reduced the valuation to $71,310. On Bolus's appeal, the court of common pleas rejected the County's expert testimony regarding valuation. Bolus's expert testified that the property, both wetland and non-wetland, had a value of $1,000 per acre. Notwithstanding, the court determined the property's value to be $0 for assessment purposes.

While the County's appeal to this Court was pending, Bolus was granted the wetland crossing permit; we therefore remanded the matter for additional testimony. The County then presented evidence that the permits had been issued. Bolus presented evidence that replacement wetlands would need to be created to replace the 1.6 acres of displaced wetlands. Bolus further offered that despite the issuance of

the permits, the property still had a $0 value for assessment purposes. The court of common pleas once again determined the value of the property to be $0.

On appeal, we reversed the court noting that Bolus's own testimony was insufficient to support a finding that the property had no value. We thus vacated the court's order and remanded for further findings based on the record. On remand, the court once again determined that the property had no value.

Monroe County appealed a second time. We concluded that since our earlier decision found Bolus's testimony to be incompetent, the court erred in determining that the property had no value because both parties' experts testified that the property had some value. Hence, we again vacated the court's order and remanded the matter for further proceedings to be heard by another judge of the court.

In *Krygier*, the landowner alleged that The Fourth to Eighth Class County Assessment Law[8] mandated a temporary reduction in the assessed value of his property where he was precluded from proceeding due to a sewer connection ban. We rejected the landowner's position because his alleged inability to connect to the sewer system was not the result of a ban by the DEP as required by law. Additionally, we distinguished our decision in *Monroe County Bd. of Assessment Appeals v. Miller*, 131 Pa.Cmwlth. 538, 570 A.2d 1386 (1990), on the ground that in *Miller*, the landowner provided testimony regarding the effects of benzene contamination on the property's value. In *Krygier*, the landowner presented no expert testimony regarding the property's value. Finally, we cited *Bolus II* for the proposition that the property may have possible future uses once all the applicable permits were obtained.

Finally, in *Air Prods. & Chems.*, the taxpayer petitioned the Lehigh County Board of Assessment Appeals to reduce the $74 million fair market value assigned to its facilities. The board of appeals denied the petition and the taxpayer appealed to the court of common pleas. The taxpayer's expert valued the property as a single parcel and opined that the fair market value of the property was between $50 and $57 million. The board of appeals then presented its expert testimony. The board's appraiser, however, valued the property as two separate parcels, dividing the taxpayer's office space from its other facilities. The appraiser's estimate of the fair market value of the property ranged from $66 to $72 million. The court of common pleas accepted the taxpayer's valuations and ordered that taxpayer was entitled to a refund for overpayments made during the tax years in question.

On appeal to this Court, the board of appeals argued that the court of common pleas improperly based its valuation of the property on the taxpayer's specific use of the property rather than its highest and best use. In rejecting this claim, we stated

> [t]he [board of appeals'] theory of valuation appears to be based upon a misunderstanding of the concepts of both highest and best use and value-in-use. As noted by this court in [*Bolus I* ], the highest and most profitable use to which land is adaptable is *one factor* to consider in determining the price, "which a purchaser, willing but not obligated to buy, would pay an owner willing but not obligated to sell." 613 A.2d at 182. The appellate courts of this Commonwealth have held that reasonably foreseeable

8. Act of May 21, 1943, P.L. 571, *as amended,* 72 P.S. §§ 5453.101–5453.706.

prospects for a property which exist at the time of an assessment may be considered in determining a property's fair market value, e.g. its probable use, lease or sale. However, consideration of factors based upon pure speculation, such as what the property would be worth in an altered condition are irrelevant to the issue of fair market value.

In other words, hypothetical ways in which the property could be used by potential buyers should be considered in determining what a willing buyer would pay for the property. That is not to say, however, that the property should be valued as though it were already in that hypothetical condition. For instance, a large farm may have greater potential value if the land were subdivided into one acre lots for single family homes, but while that *potential* must be considered, the property may not be taxed as though it were currently subdivided and developed. Accordingly, even if the [court of common pleas] accepted the opinion of the [board of appeals'] expert that subdivision was the highest and best use, it would have been error to value the property as though it were, in fact, two separate parcels.

*Air Prods. & Chems., Inc.*, 720 A.2d at 793–794 (citations omitted).

While we agree generally that possible future uses of property must be considered in ascertaining that property's fair market value, we do not agree that the trial court ignored the property's potential future development.[9]

The trial court adopted Boyer's appraisal of the property's fair market value. In doing so, the trial court accepted Boyer's opinion that the current highest and best use of the property was that of wetlands and that the sales comparison approach[10] was the most appropriate method of valuation. The court adopted Boyer's appraisal because of the current environmental conditions of the property and the DEP's failure to issue the necessary permits to date.[11] A review of Boyer's testimony reveals that he considered the three methods of valuation in arriving at his appraisals, but that he rejected the cost

---

9. We further reject the Board's position that the trial court incorrectly believed that it had to value the property in a mitigated or unmitigated state. Relying on the fact that the Board had reduced the property's assessed value from $198,715 to $125,000, it concludes that it gave proper consideration to the effects of the wetlands, flood plains, and potential future economic development. Landowner's appraisal considered the property in an unmitigated and a mitigated state: $54,000 and $900,000, respectively. Where Landowner presented credible evidence to rebut the assessment, the Board could no longer rely on the assessment record and had to produce evidence to rebut that presented by Landowner. *Strawbridge & Clothier, Inc. v. Bd. of Assessment Appeal of Delaware County*, 89 Pa. Cmwlth. 198, 492 A.2d 108 (1985). In this case, the Board presented the testimony of Riley, the County's chief assessor. Riley testified that he appraised the property at its highest and best commercial use, resulting in a fair market value of $397,430. He did not, however, participate in the Board proceedings where the fair market value was reduced to $250,000. Therefore, he could not testify as to what factors the Board considered in reducing the property's fair market value. The trial court, in its *de novo* review, was then left to determine the property's fair market value based on the *evidence presented* which included Boyer's appraisals and did not include evidence of how the Board determined the property's fair market value to be $250,000.

10. The trial court is vested with the discretion to decide which method of valuation is most appropriate and applicable to a given property. *In Re PP&L, Inc.*, 838 A.2d 1 (Pa.Cmwlth. 2003).

11. Isgan testified that he has been working with the DEP on this matter since 2001. (R.R. 117a)

and income approach due to the property's lack of development.

Addressing the Board's argument, the trial court noted that it must consider only those uses that are "reasonably foreseeable." Citing *In re Johnstown Assocs.*, 494 Pa. 433, 439, 431 A.2d 932, 935 (1981), the court recognized that

> [r]egarding the relevant scope of the value inquiry, this Court has stated: "The reasonably foreseeable prospects for the property during the subject [assessment period] its probable return on capital, its probable use and occupancy, its probable lease and/or sale, etc. form a legitimate area of inquiry. Whatever factors are based upon a *reasonable probability existing at the time of the assessment*, as opposed to pure speculation, are relevant to the question of value ... While not controlling, they are not irrelevant...." [*McKnight Shopping Center, Inc., v. Board of Property Assessment, Appeals and Review*, 417 Pa. 234, 242–243, 209 A.2d 389, 393 (1965)] (Emphasis added.)

The trial court then considered the interplay between the Supreme Court's decision in *McKnight* and our decisions in *Bolus I* and *II* to conclude that (1) the property at issue is incapable of development in its present condition, (2) although it has significant potential as a commercial cite if the wetland and floodway issues were resolved, approval from the DEP was not in hand or could not be considered probable at the time, (3) if approval to remediate the property is granted, it will cost approximately $200,000 and (4) there is no way to determine how long the DEP application process will take. The trial court further determined that Boyer's method of calculating the fair market value of the property as it is currently affected by the environmental limitations was the clearest and fairest method to value the property. It also found that the likelihood of Landowner obtaining the permits was uncertain.

Thus, in accord with *McKnight* and *Bolus I* and *II*, the court determined that mitigation was not "reasonably foreseeable" and that, therefore, the property should not be valued as if it was in that hypothetical state. Hence, we reject the Board's argument that the trial court failed to consider any potential future development of the subject property.

■ The Board further maintains that the trial court erred in accepting Boyer's testimony regarding valuation because he failed to consider (1) the likelihood that the DEP will issue mitigation permits to Landowner, (2) the economic feasibility of mitigating the property, (3) the desirability and feasibility of mitigating the property and (4), the value of the property in regard to the placement of signs and towers on the property.[12] The Board also complains that Boyer's methodology, *i.e.*, comparing the sale of wetland and non-wetland properties and then discounting the fair market value of the subject property in a mitigated state, was flawed because it failed to take into consideration the property's location near the Turnpike. These factors, however, are relevant to the weight that should be given the expert's testimony. As fact finder, the trial court was free to judge the considerations, or lack thereof, upon which Boyer's appraisal was made in determining whether Landowner suffi-

12. The Board further suggests that because Boyer was unaware of the fair market value of the properties which he compared to the subject property, the appraisal was worthless to the trial court. We disagree. As previously noted, Somerset County assesses property at half the fair market value. Therefore, simple math would provide the trial court with the property's fair market value as noted on the assessment records.

ciently rebutted the Board's assessed value.

Because the trial court's order is in accordance with the law and supported by the record, we affirm.

### ORDER

AND NOW, this 28th day of April, 2005, the June 21, 2004 order of the Court of Common Pleas of Somerset County is AFFIRMED.

DISSENTING OPINION BY Judge PELLEGRINI.

Because the methodology used by the trial court and the majority, as evidenced by the facts in this case, does not represent what a willing buyer would pay to a willing seller, I respectfully dissent. The reason that it does not represent fair market value is because, underlying the trial court's and the majority's fair market determination of value is the assumption that the property must be valued as wetlands that cannot be developed. Because the evidence is undisputed that the wetlands can be abated and the owner has refused offers higher than the assessment, I would hold that the actual value of the property is what a willing buyer would pay, assuming the risk of mitigating the property's wetland status.

Gilmour Properties acquired 2.28 acres of unimproved land (the Property) right off of an exit of the Pennsylvania Turnpike in Somerset Borough, Somerset County, with a frontage along the Turnpike Access Road. The Property is located in one of the fastest growing and most desirable commercial areas in Somerset County, and this area contains property with the highest values in Somerset County. The Property, however, has been designated as wetlands by the Department of Environmental Protection (DEP). It lies entirely within the flood plain.

After Gilmour Properties appealed the initial fair market determination of $397,430 with an assessed value of $198,715 (i.e.,½ the fair market value), the Board of Assessment reduced the Property's fair market value to $250,000 with an assessed value of $125,000. Gilmour Properties appealed that decision to the trial court.

At the *de novo* hearing, Gilmour Properties presented the testimony of its expert who, using a comparison approach to valuation, determined that the Property's estimated fair market value was $54,000, and the assessed value for tax purposes should be $27,000. He based these figures on the fact that (1) the Property was designated as wetlands by DEP; (2) it was on the flood plain; (3) the possibility of obtaining a permit to remove the wetland status and make it developable was speculative, and (4) the process for securing the permit and mitigating the wetlands would cost $200,000.

However, Gilmour Properties' witness stated that non-wetlands with the same characteristics/location of the subject Property would be valued at $900,000. Gilmour Properties' representatives also testified that they would not sell the property for $54,000 and, in fact, had received offers in excess of $400,000 for the property in a mitigated state. They also stated that they made a counter-offer of $600,000 to that buyer to cover the estimated costs of mitigation ($200,000). Additionally, the Property was listed on the market for sale in the range of $550,000 to $600,000.

The trial court adopted the methodology of Gilmour Properties' expert and remanded the case to the Board so that it would re-calculate the assessment of the Property at $27,000, reasoning that because the property was designated as wetlands and because the possibility of future commer-

cial development, which was based on the acquisition of a permit from DEP, was speculative at best and highly costly, the Board's original assessment was unlawful. Rejecting the Board's appeal, the majority affirmed the trial court essentially on the same reasoning. Because the value must be determined by what a willing buyer would pay who would assume the risk of mitigation, I dissent.

As the majority correctly points out, Section 402 of The General County Assessment Law[1] provides that for tax assessment purposes, real estate must be valued at its "actual value." *ENF Family Partnership v. Erie County Board of Assessment Appeals,* 861 A.2d 438 (Pa.Cmwlth. 2004). "Actual value" is the price a willing but not obligated seller would accept from a willing but not obligated buyer "taking into consideration all uses to which the property is adapted and might in reason be applied." *Id.* at 440 n. 4 (quoting *F & M Schaeffer Brewing Company v. Lehigh County Board of Appeals,* 530 Pa. 451, 457, 610 A.2d 1, 3 (1992)).

In this case, nothing in the record indicates that the Property cannot be mitigated, as all other similarly situated landowners in this area were granted permits to mitigate wetlands. This is confirmed by Gilmour Properties' own witness who testified that the Property in a mitigated state is worth $900,000; it is listed on the market for sale in the range of $550,000 to $600,000; there was at least one willing buyer who made an offer of $400,000 for the property if it was mitigated to which Gilmour Properties counter-offered for $600,000 to cover the estimated cost of mitigation ($200,000); and Gilmour Properties' representatives even stated that they were unwilling to accept $54,000 for the Property if offered. Additionally, mitigation would be economically feasible even though the estimated cost is $200,000, given the undisputed fact that the Property, if or when it is mitigated, could sell for $900,000, just as similar properties have sold for in this highly profitable location.

What this evidence shows is that the actual value of $54,000 set by the trial court and endorsed by the majority only represents a value of the Property in its current, unmitigated state as wetlands. It does not represent what a buyer may be willing to offer for the Property in an *unmitigated* state, assuming the risk that the property could be mitigated, with a value of $900,000. Because I would remand to the trial court to find what a buyer would pay for that Property assuming the risk of mitigation, I respectfully dissent.

1. Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–402.