**CRAFTMASTER MANUFACTURING, INC., Appellant**

v.

**BRADFORD COUNTY BOARD OF ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued April 3, 2006.

Decided July 26, 2006.

---

Brian S. Duff, Wellsboro, for appellant.

Robert T. Sonnenberg, New Britain, for appellee, Towanda Area School District.

BEFORE: McGINLEY, Judge, LEADBETTER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge McGINLEY.

Craftmaster Manufacturing, Inc. (Craftmaster), a manufacturer of Masonite doors and products from timber, owns a 290–acre parcel of real estate and a manufacturing plant located in Bradford County (County), Pennsylvania. Craftmaster's manufacturing facility consists of approximately 35 buildings that total over 800,000 square feet. The parcel also includes 198 acres of land which support a sewage treatment facility, spray field, monitoring wells, and a fiber storage "landfill" referred to as "Mount Masonite."

On July 1, 2003, Craftmaster received notice of its 2004 tax assessment. The fair market value, according to the tax assessment, was $13,957,000. The assessed value of Craftmaster's property (Property)

was fifty percent of this value or $6,978,500.

Craftmaster's timely appealed its 2004 tax assessment to the Bradford County Board of Assessment (Board) was denied. Craftmaster appealed to the Bradford County Common Pleas Court (trial court) pursuant to Section 704(a) of the General County Assessment Law (Law), 72 P.S. § 5453.704.[1]

At the *de novo* hearing before the trial court on April 18, 2005, the County introduced the official assessment card into the record which was accepted by the trial court as *prima facie* evidence of the validity of the assessment. To counter the County's evidence, Craftmaster presented the testimony of Donald Goertel (Goertel), a real estate appraisal expert, who offered the opinion that the fair market value of the property was $6,225,000.

At the hearing, Goertel described the layout of the manufacturing facility. He described the plant as a scattering of multiple, non-uniform buildings in varying heights which were modified over the years to accommodate Craftmaster's specific machinery equipment and manufacturing processes. Notes of Testimony, April 18, 2005, A.M. Session, (N.T. 4/18/05 A.M. session) at 18; Reproduced Record (R.R.) at 230a. According to Goertel, the presence of stacks and vents (holes) in the ceiling and walls, and the non-uniformity of the buildings make the buildings potentially obsolete for the general industrial market, and would be a negative consider-

ation to a potential buyer; whereas a "nice rectangular space" with "clean roof lines" would be more adaptable to a number of uses. N.T. 4/18/05 A.M session at 19, 57; R.R. at 231a, 269a. Goertel opined that Craftmaster was a "very, very complex property" with its own water treatment facility, and sewage treatment plant. N.T. 4/18/05 A.M. session at 24–25; R.R. at 236a–237a.

Goertel also testified that there were four former residences located on Craftmaster's property which he did not believe should be valued separately from the rest of the facility. He appraised those residential structures as though they existed as part of the contributory value of the overall site. The property was a single tax parcel and he appraised as it existed at the time of the appraisal. Goertel opined that it was improper according to the "Air Products case"[2] to appraise those residences separately as though the property was subdivided, or make hypothetical valuations. N.T. 4/18/05 A.M. session at 68; R.R. at 280a.

To arrive at his independent assessment values, Goertel testified that he considered all three of the traditional approaches used to conduct an appraisal of property, namely the cost, income and sales approaches, and concluded that the sales comparison approach was the most appropriate for the Property. N.T. 4/18/05 A.M. session at 29–30; R.R. at 241a–242a. Goertel used five comparables located in Cumberland, Luzerne, Lackawanna, Lycoming and

---

1. Act of May 21, 1943, P.L. 541, *as amended.* Section 704(a) of the Law, 72 P.S. § 5453.704(a) states:

 Any person who shall have appealed to the board for relief from any assessment, who may feel aggrieved by the order of the board in relation to such assessment, may appeal from the order of the board to the court and thereupon the court shall proceed at the earliest convenient time to be by

 them appointed, of which notice shall be given to the board to hear the said appeal and the proofs in the case, and to make such orders and decrees determining from the evidence submitted at the hearing.

2. *Air Products and Chemicals, Inc. v. Board of Assessment Appeals of Lehigh County,* 720 A.2d 790 (Pa.Cmwlth.1998).

Montgomery Counties. After comparing and analyzing the prices paid for those properties, Goertel arrived first at "range of value" ($2,500,000–$9,925,000), which he used to determine the fair market value of the Property. Two of Goertel's comparables were also used by the County's expert.

It was Goertel's opinion that the highest and best use of the Property was as an industrial plant for which there would be a limited demand given the size, design, layout and location.

After Craftmaster rested, the County did not dispute that Craftmaster successfully overcame the presumed validity of the tax assessment appeal card. When counsel argued that Craftmaster met its burden via the testimony of Goertel, the County did not disagree or object. N.T. 4/18/05 A.M. session at 116, R.R. at 328a. No motion for a directed verdict was proffered. Instead, the County chose at that point to present its own expert, Vincent Dowling (Dowling), who testified that he used the sales comparable and income capitalization approaches to value that property. The sales comparison approach was considered the primary indicator of value in his analysis while the income approach was given secondary emphasis.

Dowling viewed the Property as three separate tax parcels and assigned separate values as to (1) what he considered to be "excess land"[3], (2) non-industrial buildings, and (3) the main industrial plant, which comprised 55 acres and was en-

closed by a six-foot high fence. It was Dowling's opinion that the separate and distinct nature of each of these three aspects of the Property justified that they be assigned separate values. Dowling concluded that the fair market value of the property was $13,565,000, which was approximately $400,000 less than the County's official assessment.

After the County presented its expert, its counsel specifically agreed that the trial court should look at "both appraisal reports in trying to arrive at what is the appropriate market value." Notes of Testimony, April 18, 2005, P.M. session (N.T. April 18, 2005, P.M. session) at 119–120; R.R. at 452a–453a.

Although both experts testified that the fair market value of the Property was less than the assessment, the trial court concluded that Craftmaster failed to prove that the property was incorrectly assessed. The trial court determined that the assessed value of the property was $6,436,800. On May 2, 2005, the trial court issued a subsequent order and vacated its April 19, 2005. The May 2, 2005, order directed that the assessed value *shall remain fixed at the initial assessment* of $6,978,500. Craftmaster appealed to this Court on May 10, 2005, and the trial court submitted a statement in accordance with Pa.R.A.P.1925(a) on October 18, 2005.[4]

On appeal Craftmaster contends that (1) the trial court erred because it failed to recognize that Craftmaster appealed two separate tax years, being tax years

---

3. Excess land is defined in appraisal literature as "[l]and in addition to that which is necessary to accommodate a site's highest and best use." *The Appraisal of Real Estate,* Eighth Edition, American Institute of Appraisers (1983) at 265.

4. This Court's review in a tax assessment matter is limited to a determination of whether the trial court abused its discretion, commit-

ted an error of law, or reached a decision not supported by substantial evidence. *Green v. Schuylkill County Board of Assessment Appeals,* 565 Pa. 185, 772 A.2d 419 (2001). While the weight of the evidence is before the appellate court for review, the trial court's findings of fact are entitled to great weight and will be reversed only for clear error. *Id.*

2004 and 2005 [5]; (2) the trial court erred because it did not set forth findings of fact and conclusions of law in its order; (3) the trial court erred when it assigned probative value and weight to the County's official assessment record because Craftmaster produced sufficient evidence to overcome the *prima facie* significance of the assessment record; and the County's own expert witness valued the property at almost $400,000 less than the official assessment record; (4) there was no substantial evidence to support the trial court's findings of fact, and conclusions of law as set forth in the Pa.R.A.P.1925(a) statement; (5) the trial court erred when it credited the County's expert witness because the County's expert witness used an improper hypothetical highest and best use analysis and the value-in-use method whereby an incorrect and increased value was placed on the Property.

### 1. *Craftmaster's Burden to Overcome the Prima Facie Significance of the Assessment Record*

Initially, Craftmaster contends that the trial court erred when it concluded that it failed to meet its burden of rebutting the *prima facie* validity of the County's assessment record because this burden may be met by simply "coming forward" with evidence from an "unquestionably qualified expert." Craftmaster asserts that it needed only to meet its "burden of production" in order to rebut the assessment record, and that it did so in this case by presenting the oral and written testimony of an "unquestionably qualified expert." This Court does not agree that this is a correct pronouncement of the law.

It is well settled that the admission into evidence of the assessment records establishes a *prima facie* case for establishing the validity of the assessed value of a property. *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 221–22, 209 A.2d 397, 402 (1965). When a *prima facie* case is established, the taxpayer then has the burden of coming forward with *competent, credible and relevant* evidence to rebut the validity of the assessment. *Id.*

A taxpayer in a tax assessment appeal does not meet his initial burden of overcoming the validity of an assessment record by simply presenting the testimony of a qualified expert appraiser. For example, if the trial court rejects the expert's testimony on the grounds that the expert was not truthful or believable, the taxpayer's burden is not met. In *M.W. Kellogg Company*, 89 Pa.Cmwlth. 320, 492 A.2d 130 (1985), the taxpayer failed to rebut the *prima facie* validity of the assessment because the trial court *did not believe* the testimony of his experts "because of the radical difference between their testimony on the valuation of the property before the board and the trial court." Id. at 131. With insufficient evidence to remove the *prima facie* validity of the assessment, the trial court was required to allow the official assessment record to stand and dismiss the appeal.

A taxpayer may also fail to meet its burden to overcome the validity of the assessment record if the trial court finds the opinion to be incompetent or irrelevant because it is either legally or factually flawed. In *Penn's Grant Associates v. Northampton County Board of Assessment Appeals*, 733 A.2d 23 (Pa.Cmwlth.

**5.** The parties agree that this Court should remand to the trial court with directions to modify its May 2, 2005, order to specify it applied to both tax years. In addition, the trial court acknowledged in its Pa. R.A.P. 1925(a) statement, the deficiency and the necessity to remand for the purpose of modifying the May 2, 2005, order.

1999), a taxpayer brought an action challenging Northampton County's assessment of lots in a planned residential development. At trial, the board introduced the official assessment record. The taxpayer then offered the testimony of its expert appraiser who testified that she did not appraise each individual lot, instead she used the "development approach" to value and placed a value on the raw acreage to be developed. The trial court found that the expert did not use the correct method of appraisal and, therefore, concluded that taxpayer did not offer sufficient evidence to overcome the board's assessment. *Penn's Grant*, 733 A.2d at 28. This Court affirmed the trial court's conclusion that the taxpayer failed to present evidence to rebut the *prima facie* validity of the assessment.

This principle was also applied in *Gitney v. Berks County Board of Assessment*, 160 Pa.Cmwlth. 647, 635 A.2d 737 (1993), where the taxpayers challenged their assessment as "not uniform." In such a case, the taxpayer's burden to overcome the *prima facie* validity of the assessment is met by showing that a lower ratio of assessment to fair market value has been applied to comparable properties.

In *Gitney*, the taxpayers purchased property in 1986 for $44,000. The assessed value was $2,400. The property was reassessed in 1987 at $4,000, and the taxpayers challenged the reassessment. At the trial *de novo*, the Berks County Tax Assessment Board moved into evidence, without objection, the tax assessment record. To rebut this evidence, the taxpayers presented a real estate valuation expert who testified as to assessments of comparable properties. The expert testified that he looked at homes in the proximity of the taxpayers' home and determined that the taxpayers' property was "way over assessed" and that the market value of comparable properties "would be far in excess" of the taxpayers' property. *Gitney*, 635 A.2d at 741.

The Court of Common Pleas of Berks County (common pleas court) rejected the expert's testimony because it was "insufficient to sustain the burden of proof required under the law." *Gitney*, 635 A.2d at 740. On appeal, this Court affirmed. Without evidence to show that the fair market value of comparable properties was different from that found by the board, the common pleas court was left without information upon which to base a finding as to the current market value or determine the issue of uniformity. "Gitney should have presented evidence on fair market value instead of presenting general testimony qualifying certain properties as inferior or superior to his property." *Gitney*, 635 A.2d at 742. *See also Mathies Coal Co. Appeal*, 435 Pa. 129, 255 A.2d 906 (1969).

Another case which is instructive is *Appeal of Carnegie*, 357 Pa. 138, 53 A.2d 425 (1947). In *Carnegie*, owners of the Carnegie Building appealed the City of Pittsburgh and Allegheny County's assessments for 1943–1945. At the trial *de novo*, the owners called three real estate experts who acknowledged that the Carnegie Building was leased. However, they did not base their estimates of value upon the realities. They sought rather to speculate regarding probable values by assuming the non-existence of the lease. The Court of Common Pleas of Allegheny County accepted this evidence and concluded that the owners had met their initial burden and proved the incorrectness of the official assessment record. Our Pennsylvania Supreme Court reversed. "Estimates of value … which are speculative and conjectural and are not competent evidence of present actual value … [t]he valuation fixed by the court below was not based upon any competent evidence of record.

The incorrectness of the Board's assessment has not been proven and it must, therefore, be reinstated." *Carnegie*, 357 Pa. at 141, 53 A.2d at 427.[6]

In the present controversy, Goertel's testimony was rejected because the trial court found it to be legally and factually flawed and not sufficient to rebut the *prima facie* validity of the assessment. As our Supreme Court observed, "[t]he duty of the trial court in hearing a tax assessment appeal *de novo* is to independently determine the fair market value of the parcel on the basis of the competent, credible and relevant evidence presented by the parties." *Westinghouse Elec. Corp. v. Board of Property Assessment of Allegheny County*, 539 Pa. 453, 463, 652 A.2d 1306, 1311 (1995). Here, the trial court concluded that Goertel's testimony fell short of the quality of evidence upon which it could reasonably rely. Specifically, the trial court rejected Goertel's testimony because (1) two of his five sales comparables were of questionable comparability; (2) his report was not a "complete appraisal" but a "summary report" intended for settlement negotiations; (3) his adjustments for location/access were flawed because his calculation of distance from the interstate highway was off by 35 miles; (4) he did not consider the value of having rail service at the Property; (5) his appraisal failed to consider the property's highest and best use because he assumed incorrectly that he could not consider the potential for subdividing the lots containing existing houses; (6) he misinterpreted the holding in *Air Products*; (7) he failed to consider the plant's proximity to natural resources such as forests and the Susquehanna River; and (8) his upward adjustment of only $85,000 for a recently constructed warehouse, which admittedly cost Craftmaster $304,000, was "simply not credible." Trial Court's Rule 1925(a) Statement, October 18, 2005, at 1–3.

■ Contrary to Craftmaster's contention, it is not enough to merely present evidence from a qualified expert. The evidence must be *sufficient to rebut* the validity of the assessment which means the evidence must be (1) believed in the sense that the trial court accepts the veracity of the expert based on, for example, his demeanor; and (2) relevant and competent in the sense that it is not dubious, but legally and factually sound so that it is of practical value to the court in its effort to arrive at the fair market value. Of course, only the latter is reviewable by this Court, *Koppel Steel Corporation v. Board of Assessment Appeals of Beaver County*, 849 A.2d 303 (Pa.Cmwlth.2004).

## 2. Whether the Trial Court's Rejection of Goertel's Testimony w as Supported by Substantial Evidence

Craftmaster asserts, in the alternative, that several of the reasons stated by the trial court for rejecting Goertel's opinion were not supported by substantial evidence. Craftmaster contends that the trial court erroneously found that (a) Goertel miscalculated the square footage in two of his comparables; (b) Goertel's remaining comparables were doubtful due to the flaws in the first two comparables; (c) Goertel's expert report was a "summary appraisal" as opposed to a "full appraisal"; (d) Goertel's opinion lacked credibility because he overestimated the distance between the Property and the interstate highway by 35 miles; (e) Goertel's opinion lacked credibility because he opined that

---

**6.** *See also Chatfield v. Board of Revision of Taxes*, 346 Pa. 159, 29 A.2d 685 (1943), where the testimony of the taxpayer's expert as to the property's future worth, or in an altered condition, was too speculative and fanciful to rise even to the standard of an opinion.

the value of the 11,000 square foot addition, which cost $304,000 to construct, had the same value as the rest of the plant, i.e., $8 per square foot or $85,000.

### (a) and (b)—Miscalculation of Square Footage

██ According to the trial court, two of Goertel's comparable sales were not reliable. Goertel's first comparable was a one-story building known as the former General Cable property. He testified that the building consisted of 317,483 square feet which sold for $7.80 a square foot. N.T., 4/18/05 A.M. session at 49–50; R.R. at 261a–262a. Dowling, the County's expert, testified that Goertel made no allowance for the fact that approximately one-quarter of the square footage (75,000 square feet) of the building was below grade, basement area and that the building was currently on the market for between $2.9 million and $3 million. N.T. 4/18/05 P.M. session at 86; R.R. at 419a.

The second of Goertel's comparable sales, Appleton Paper in Cumberland County, was assumed by Goertel to have an enclosed area of 870,000 square feet and sold for $10.92 per square foot. N.T. 4/18/05 A.M. session at 51; R.R. at 263a. The County's expert, however, testified that he personally went to the property and according to the tax records he obtained from the Cumberland County Assessment Office, he determined that the enclosed area of the property was actually 650,000 square feet. N.T. 4/18/05 P.M. session at 85; R.R. at 418a. Dowling testified, contrary to Craftmaster's expert, based on this rectification, the unit rate was approximately $14.61. N.T. 4/18/05 P.M. session at 86; R.R. at 419a.

Craftmaster contends that the trial court placed too much emphasis on these discrepancies absent any evidence of what effect, if any, they had on the valuation of the Property or if adjustments for size should have been made. This Court does not agree. There was evidence which showed that the difference in square footage yielded a unit rate of approximately $14.61, i.e. that Goertel's factual assumption was wrong. Again, it was Craftmaster's affirmative burden to produce competent evidence which disproved the official assessment. If these discrepancies were inconsequential to the valuation then it was incumbent on Craftmaster to clarify and persuade the trial court of its position.

As the record stands, the trial court's conclusions were supported by substantial evidence provided by the County's expert.

### (c) "Summary Appraisal" Versus "Full Appraisal"

██ With respect to Goertel's expert report, Craftmaster admits it was not a "complete appraisal" but was a "summary report" which stated that it was initially intended for settlement negotiations.[7] Craftmaster asserts that the trial court "overstated the significance of this issue" and "should not have used this as one of the factors to find [its] expert wholly without credibility." Brief of Appellant, November 28, 2005, at 22.

This Court has reviewed both reports and agrees with Craftmaster that there is virtually no difference between the content and substance of Goertel's report and Dowling's report which would justify the trial court's rejection of Goertel's opinion on this basis. Both reports examined five comparable sales. Each described the Property in detail and provided a through community and neighborhood analysis. Each was approximately 50 pages in length. Each contained exhibits showing

---

7. The report was actually entitled "Summary Report–Limited Appraisal."

the location and layout of the Property. Each listed the qualifications of the appraiser and the methodologies they used.

The trial court's conclusion that Goertel lacked credibility because his report was entitled a "summary appraisal" as opposed to a "full appraisal" was not supported by substantial evidence. Absent an analysis of the content of the two reports in comparison there was no legitimate basis to reject Goertel's opinion based on form over substance.

#### (d) Distance Between the Property and the Interstate

Next, Craftmaster contends the trial court erroneously held that Goertel's opinion was not credible because he erred in his calculation of the property's distance from the interstate. The trial court called into question Goertel's 15 to 30 percent downward adjustments to his comparable sales because evidence showed that Interstate 86 was located 20 miles from Craftmaster's plant, not 55 miles, as Goertel had testified. Craftmaster does not dispute that Goertel made this mistake, but contends that the trial court's retort was "too harsh." This Court disagrees.

Goertel's error was relevant to the weight to be given to Goertel's opinion. As the fact finder, the trial court was free to judge the accuracy of Goertel's factual assumptions, or lack thereof, upon which Goertel's appraisal was made in determining whether Craftmaster sufficiently rebutted the County's assessed value. *Gilmour Properties v. Board of Assessment Appeals of Somerset County*, 873 A.2d 64 (Pa.Cmwlth.2005). The trial court's finding was supported by substantial evidence.

#### (e) Value of the 11,000 Square–Foot Addition

Finally, Craftmaster contends that the trial court's conclusion that Goertel failed to properly value the 11,000 square foot addition was not supported by substantial evidence. Again, the record belies Craftmaster's contention. Dowling testified that Goertel greatly underestimated the value of the addition. N.T. 4/18/05 P.M. session at 88–90; R.R. at 421a–423a. The trial court was free to consider this testimony to judge the accuracy of Goertel's assumptions in determining whether Craftmaster sufficiently rebutted the County's assessed value.

### 3. Whether the Trial Court's Rejection of Goertel's Opinion and his Acceptance of Dowling's Opinion was Base d on Legal Error

Craftmaster next asserts that the trial court's rejection of Goertel's testimony and acceptance of Dowling's was also based on numerous errors of law.

One legal issue that was disputed was how to value the land surrounding the plant and the former residential structures that were used to support Craftmaster's operations. As noted above, Craftmaster's property consists of the large main plant, 198 acres of land and at least four other separate structures that at one time were residences. They were being used as offices, a guest house, credit union, a training facility and a maintenance/storage facility.

Both experts believed *Air Products* controlled but each expert interpreted that case differently. Craftmaster's expert interpreted *Air Products* to mean that the trial court, in determining fair market value, could *not* consider a taxpayer's property in an altered condition, such as being a fully completed subdivision. The Board's expert, on the other hand, performed separate sales comparison analyses for the excess land and each of the buildings. His opinion emphasized the fact that the struc-

tures were "non-industrial improvements" which were located on dedicated roads, not on the plant's interior roads. He assigned separate values to them because they were located outside of the fenced-in line of the industrial facility, and could potentially be subdivided.

The trial court accepted Dowling's interpretation of *Air Products* and rejected Goertel's opinion:

> Mr. Goertel's appraisal failed to consider the property's highest and best use, because he assumed incorrectly, that he could not consider the potential for subdividing the lots containing existing houses which are used by Craftmaster for a variety of purposes. The houses are located along a public road. Mr. Goertel misinterpreted the holding in (Air Products) by concluding that he could not consider subdivision. In fact, Air Products ... makes clear that although a property can not be taxed as though it were currently subdivided, the *potential* for subdivision must be considered in determining what a willing buyer would pay for the property. (emphasis in original).

Trial Court's Rule 1925(a) Statement, October 18, 2005, at 3.

The trial court also accepted Dowling's opinion that the Property had an increased value due to its close proximity to raw materials, specifically timber:

> Mr. Goertel admitted that he failed to consider the plant's proximity to natural resources such as forests and the water resources of the Susquehanna River. The plant has frontage along the River. Mr. Goertel seemed to believe that because Craftmaster is in a forest product business, considering these resources would amount to consideration of value-in-use. In fact, consideration of the availability of natural resources merely recognizes the higher value which would

be placed upon the property by some of the market's potential buyers.

Trial Court's Rule 1925(a) Statement, October 18, 2005, at 3.

Craftmaster argues that the trial court erred when it credited Dowling because he erroneously (a) considered the acreage surrounding the plant to be "excess land" and valued it separately using a hypothetical highest and best use analysis; (b) considered each of the former residential dwellings on the Property separately as though the Property had been hypothetically subdivided and rezoned residential, and (c) considered the Property's proximity to timber. Craftmaster contends that these errors resulted in an incorrect and increased fair market value.

A. *Whether the Trial Court Erred When it Considered Testimony regarding the Probable Market Value of the Surrounding Land and the Former Residential Dwellings on the Property*

 i. *Former Residences*

This Court has held that reasonably foreseeable prospects for a property which exist at the time of an assessment may be considered in determining a property's fair market value, e.g., its probable use, lease or sale. However, consideration of factors based on pure speculation, such as what the property would be worth in an altered condition are irrelevant to the issue of fair market value. *Gilmour Properties.* In addition, a trial court may not base the fair market value of a property by speculating what its value might be if it was rezoned from its current designation. Such testimony would be purely conjecture. *ENF Family Partnership v. Erie County Board of Assessment Appeals,* 861 A.2d 438 (Pa.Cmwlth.2004).

Craftmaster argues that Dowling's opinion of the Property's worth in an al-

tered condition, i.e., subdivided and sold as residential homes, was legally incorrect and should not have been (to the extent that it was) considered by the trial court. Specifically, Dowling opined that the "probable" market value for the credit union building was $110,000; the "probable" market value of the guest house was $90,000; the "probable" market value of the training center was $80,000; the "probable" market value of the Corbett house was $80,000; and the "probable" market value of the Gray house was $175,000. His expert opinion that the plant's ancillary buildings could be subdivided and sold off as residences and his valuation of the parcels in that altered state was too speculative and it was legal error for the trial court to base its decision on that testimony. *ENF Family Partnership*. This Court agrees with Craftmaster.

In *Air Products*, taxpayer petitioned the Lehigh County Board of Assessment Appeals to reduce the $74 million fair market value assigned to its facilities. The board denied the petition and taxpayer appealed to the trial court. The taxpayer's expert valued the parcel (including the facilities and office space) as a single, indivisible tract and opined that its fair market value was between $50 and $57 million. The board's appraiser, however, valued the property as two separate, independent parcels, dividing as one tract the taxpayer's administration buildings and the fitness center and the other tract containing the company's research and development facilities. This Court held that the trial court correctly accepted the taxpayer's valuation.

The appellate courts of this Commonwealth have held that *reasonably foreseeable prospects for a property which exist at the time of an assessment may be considered in determining a property's fair market value, e.g., its probable use, lease or sale. However, consideration of factors based upon pure speculation, such as what the property would be worth in an altered condition are irrelevant to the issue of fair market value.*

In other words, hypothetical ways in which the property could be used by potential buyers should be considered in determining what a willing buyer would pay for the property. *That is not to say, however, that the property should be valued as though it were already in that hypothetical condition.* For instance, a large farm may have greater potential value if the land were subdivided into one acre lots for single family homes, but while that potential must be considered, the property may not be taxed as though it were currently subdivided and developed. Accordingly, even if the trial court had accepted the opinion of the County's expert that subdivision was the highest and best use, *it would have been error to value the property as though it were, in fact, two separate parcels.*

*Air Products*, 720 A.2d at 793 (emphasis added).

As to the interpretation of *Air Products*, Craftmaster argues that the trial court erred when it accepted Dowling's interpretation. First, contrary to the trial court's finding, Goertel did consider the *possibility* for subdivision of the property under *Air Products*, but dismissed it as a possibility because the Property is taxed as a single tax parcel and, ultimately, the property may not be taxed as if it was already subdivided. N.T. 4/18/05 A.M. session at 27–28; R.R. at 239a–240. Goertel's approach was entirely consistent with the holding of *Air Products*.

Dowling, on the other hand, employed a comparable sales analysis (using the recent

sale of residential homes in the area) and assigned a separate value to the structures, hypothetically, as though they were already in the altered, subdivided condition, much like the board's expert did in *Air Products*. This Court does not agree that Dowling's opinion represented a "reasonably foreseeable prospect" for the Property which existed at the time of his assessment. Although he couched his opinion in terms of the "probable" market value, there was no evidence that Craftmaster had any present (or future) intention of selling those structures as residences. In fact, the evidence indicated that the reason that the owners sold their homes in the first place was because of their undesirable location next to the plant. N.T. 4/18/05 A.M. session at 27; R.R. at 239a. There was also no indication that the Property, which was located in an industrial zoning district, would or could be subdivided and rezoned residential.[8] Dowling's opinion was purely speculative and the precise type of valuation testimony proscribed by *Air Products* and *Gilmour*. Dowling should have based his value on the Property "as is", rather than its value when configured into its hypothetical highest and best use.

To the extent that it did accept Dowling's opinion in this regard, Craftmaster is correct that the trial court erred.

### ii. Land Surrounding the Plant

■ Dowling also treated the Property as having approximately 116 acres of "excess land" and valued that parcel separately.[9] He testified that this parcel had its own "highest and best use" and could be sold off to smaller industrial businesses because it existed separate and distinct

from the "parent parcel," had its own frontage and could be accessed by dedicated roads. N.T. 4/18/05 P.M. session at 20–21; R.R. at 353a–354a. He then opined that the probable market value of the excess land was $630,000.

Craftmaster contends the trial court erred to the extent that it accepted Dowling's characterization of the 116–acre tract as "excess land" and his opinion that it had a separate utility in the marketplace.

According to Dowling, the excess land currently supports the sewage treatment plant, spray field, monitoring wells, and the 15–acre "Mount Masonite" fiber storage landfill which is under a Consent Order with the DEP to be consumed in 21 years. He then goes on to opine, "hypothetically", that the "removal of these non-taxable improvements would allow the residual land to be put to other uses and this land should be taxable." Expert Report of Vincent M. Dowling, August 5, 2004, at 20; R.R. at 103a.

From the trial court's opinion, it is unclear how the court viewed the acreage surrounding the plant. There are no findings of fact or conclusions of law in this regard. For example, the trial court did not find that this land was, in fact, "excess land" in that it was not necessary to accommodate the industrial plant's operations. There were also no findings or testimony regarding when or whether it was physically possible to remove the sewage treatment plant or fiber landfill, or whether it was financially feasible or maximally productive. In short, Dowling did not support his opinion by showing that there was a reasonable possibility that the existing

---

8. According to Dowling, the ordinance designating the zoning district as industrial was dated 1994.

9. There were approximately 198 acres of so-called vacant land, 82 of which Dowling considered to be a buffer for the industrial plant. The remaining 116 acres he considered to be "excess" land.

unacceptable conditions could or would be changed.

As with his valuation of the former residential structures, Dowling's opinion as to the value of the 116–acre tract was based on a value configured into its "hypothetical" highest and best use, not based on its value "as is." That was erroneous and contrary to *Air Products* and *ENF*. The 116–acre tract currently contains an effluent plant, monitoring wells, and a landfill. The 116–acre tract is not yet physically at a point or even near the point where it could be sold separately to smaller industrial businesses. Dowling's hypothetical highest and best use was based on ideal conditions that do not exist and perhaps won't come to fruition for decades. The Property must not be taxed on the basis of how it possibly may exist under ideal hypothetical conditions at some time in the far future. Rather, assessments are a reflection of *current* market value and consideration must be given to the uses to which the property is adapted and might reasonably be applied.

An analogous situation occurred in *B.P. Oil Co. v. Jefferson County Board of Assessment Appeals*, 159 Pa.Cmwlth. 414, 633 A.2d 1241 (1993), where this Court held that evidence of environmental contamination must be considered by the finder of fact in assessment cases in determination of fair market value. Here, the fact that a sewage treatment plant and a landfill existed on the Property must be considered in determining fair market value. To simply hypothetically eradicate them and "assume they are removed" ignores the Property's current reality and the existing negative impacts associated with it, including negative stigma, environmental impacts and statutory and regulatory clean-up costs.

The 116–acre tract simply should not be assessed and then taxed based on Dowling's hypothetical use as though that was its current and actual use. Craftmaster is correct that Dowling's testimony to the contrary should not be considered in the trial court's valuation analysis.

B. *Whether the Trial Court Erred When it Considered Testimony Regarding the Property's Close Proximity to Timber*

Craftmaster next asserts that Dowling improperly employed a value-in-use analysis and the trial court erred in giving weight to this testimony.

On cross-examination, Dowling testified that he "placed a lot of emphasis as a positive factor" on Craftmaster's close proximity to natural resources, namely timber. N.T. 4/18/05 P.M. session at 110; R.R. at 443a. His report stated that "the highest and best use of the Subject Property as improved is for use as an industrial facility." He went on to state that "[t]he probable buyer would be an owner-user who most likely uses forest related raw materials." Appraisal Report of Vincent M. Dowling, August 6, 2004, at 29; R.R. at 114a.

Craftmaster contends that by emphasizing the Property's proximity to timber, Dowling improperly valued the Property based on *Craftmaster's use* and presupposed that the Property would be sold as on ongoing business which necessitated the use of timber in its manufacturing process. This is not entirely accurate.

 The value of property for a specific use and the value of that use to its owner are not relevant in determining fair market value for purposes of assessing real estate taxes. In *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals (Schaeffer Brewery)*, 530 Pa. 451, 610 A.2d 1 (1992), our Supreme Court explained the concept of "value in use" or "use value":

[U]se value or value-in-use represents the value to a specific user and hence, does not represent fair market value ... "Use value is the value a specific property has for a specific use." ...

Because value-in-use is based on the use of the property and the value of that use to the current user, it may result in a higher value than the value in the market place. Value-in-use, therefore, is *not* a reflection of fair market value and is not relevant in tax assessment cases ...

*F & M Schaeffer Brewing Co.,* 530 Pa. at 456–457, 610 A.2d at 3–4 (emphasis in original, citations and footnote omitted). In *Pittsburgh–Des Moines Steel Co., Inc. v. McLaughlin,* 77 Pa.Cmwlth. 565, 466 A.2d 1092 (1983), this Court explained that the value-in-use method is improper because such a method may well result in a value higher than that available in the marketplace.

In *F & M Schaeffer Brewing,* the subject property was a 791,382 square foot facility situated on 62 acres of land. In 1971, F & M Schaeffer built a brewery which consisted of one large irregularly shaped manufacturing plant, warehouse and numerous small special purpose buildings and silos. The property was assessed at a fair market value of $34 million in 1984. F & M Schaeffer appealed the assessment. The county's valuation experts testified that they first determined the property's highest and best use was a special purpose brewery and then applied a replacement cost approach based on the utility of the property for that use, i.e., the production of 3.5 million barrels of beer per year. The trial court accepted that fair market value determination. The Supreme Court reversed and held that was an impermissible method of determining fair market value for property tax purposes.

In their determination of fair market value, appellees' experts improperly utilized a replacement cost approach contingent upon the subject property's use as a brewery and the value of the property for that use ... The objective of a cost valuation approach is to estimate, as closely as possible, the cost to construct new the existing taxable real estate because that is, after all, the subject of the assessment—*not the production process or use of the property.*

*Id.* at 459–460, 610 A.2d at 4–5 (emphasis added).

In *McGraw–Edison Co. v. Washington County Board of Assessment Appeals,* 132 Pa.Cmwlth. 437, 573 A.2d 248 (1990), this Court determined that the taxpayer failed to establish that the taxing authority's expert utilized the impermissible value-in-use approach to valuation. The expert there testified that he "considered" the property's continued use of the manufacturing facility in valuing the property. Because the expert did not base his opinion of value solely upon its value to the current user, this Court determined that the value-in-use principles were not violated.

Similarly, in *Pittsburgh–Des Moines Steel Co.,* Pittsburgh–Des Moines Steel (PDM) owned six parcels of land composed of 59.595 acres on which was located a steel manufacturing plant. At trial the board's expert used the sales comparison approach for valuation and testified that, in his opinion, the highest and best use of the subject property was a heavy assembly operation by a single user similar to PDM. The trial court increased the tax assessment based on the expert's testimony. On appeal, PDM argued, *inter alia,* that the board's expert employed the value-in-use method in reaching his opinion of fair market value. However, the record indicated that the expert did not indicate that he based his opinion of value solely on the

value of the property to PDM. In fact, the record contained no mention of this impermissible technique before PDM's attorney discussed it in his closing argument. Therefore, this Court concluded that the evidence did not support PDM's contention that the expert employed the value-in-use method.

■ In the present controversy, Dowling considered the Property's location near natural resources, including timber and the Susquehanna River, to be a positive feature of the Property. This does not rise to the level of an improper value-in-use analysis. In fact, it was entirely appropriate for him in determining fair market value to consider not only the present use of the property but all of the uses including the highest and most profitable use to which the land was available and adaptable. *Mack Trucks, Inc., v, Lehigh County Board of Assessment Appeals,* 692 A.2d 661 (Pa.Cmwlth.1997).

Here, as in *McGraw* and *Pittsburgh– Des Moines Steel Co,* Dowling did not calculate the fair market value based solely, or even remotely, upon the Property's value to Craftmaster or any other manufacturer of timber products. He merely mentioned it as a positive feature in light of the fact that businesses tend to operate within Bradford County based on its abundance of natural resources which includes timber. N.T. 4/18/05 P.M. session at 14; R.R. at 347a. He discussed the presence of timber in terms of the industry and why someone would locate there.

Although he testified that the Property's close proximity to natural resources and the network of roadway and rail was a "plus" for this location, he specifically testified that he employed the comparables sales method of valuation and acknowledged on cross-examination "we were not to conclude or not to look at a special use of Craftmaster." N.T. 4/18/05 P.M. session at 15, 106; R.R. at 348a, 439a. The record simply contains no proof that either the trial court or Dowling employed an impermissible value-in-use analysis.

4. ***Whether the Trial Court Erred When it Resorted to the Official Assessment Record to Determine Fair Market Value***

Lastly, Craftmaster contends that because the trial court found the County's expert witness to be credible it was legal error for the trial court to uphold the official assessment record since its own expert valued the Property at almost $400,000 less than the original assessment record. This Court must agree. This is not a case where the County chose to rely on its official assessment.

According to the trial court's opinion, it weighed Goertel's testimony and Dowling's testimony and found Goertel's testimony "unpersuasive" which, as set forth above, was based in part on a legal error. Critically, the trial court then concluded since Craftmaster failed to rebut the presumptive validity of the official assessment record, "no further inquiry was required" and it "did not need to consider" whether the Board's expert witness' opinion as to the fair market value of the property "should prevail over the existing assessment." Trial Court's Rule 1925(a) Statement, October 18, 2005, at 9. This was also error.

■ It is well established that the factfinder's determination of fair market value must be supported by expert testimony found to be credible, and may not be based, even in part, upon the assessment record once any expert testimony is credited. *Green v. Schuylkill County Bd. of Assessment Appeals.*

■ Here, Goertel testified. At that point, the County chose not to rely solely on its assessment record in the face of

Craftmaster's countervailing evidence. In other words, it was not willing "to run the risk" of having Craftmaster's proof believed by the court. The County presented its own evidence *which actually contradicted the official assessment.* Although this Court has found no similar case, it does not hesitate to conclude that the presumption of the initial assessment's validity ended at that point, with the County's admission that the fair market value was *less than* its official assessment.

The presumption of the validity of the official assessment only remains until overcome. Here, although the official assessment may not have been overcome by Craftmaster's evidence, it *was* overcome by the County's evidence that the Property's fair market value was *lower* than originally assessed. Once the County came forward with that evidence, the trial court had no basis to refuse to reduce the assessment. When this circumstance occurs the trial court must arrive at a fair market value based on the credited evidence.

In sum, this Court concludes that the trial court erred when it (1) failed to specify that its decision applied to appeals for the tax year beginning January 1, 2004, and tax year beginning January 1, 2005; (2) summarily rejected Goertel's expert report because it was entitled "summary appraisal" when its content was virtually identical to Dowling's report; (3) credited Dowling's opinion which assigned separate values to four structures as though they had been or were in the process of being subdivided, rezoned and sold separately as residences which was contrary to the *Air Products* case; (4) credited Dowling's opinion which considered the 116–acre tract surrounding the plant as "excess land" and valued it separately as though it

"hypothetically" existed without the landfill, water treatment plant and monitoring wells, and (5) relied on the official assessment record.

Accordingly, the trial court's order is vacated and this case is remanded for the trial court to reevaluate or reweigh the evidence in accordance with this opinion. If the trial court deems it necessary to conduct further hearings, it may do so. The trial court should determine the fair market value of the Property on the basis of whatever competent, credible and relevant evidence it accepts and base its findings on the evidence of record.[10]

### *ORDER*

AND NOW, this 26th day of July, 2006, the order of the Court of Common Pleas of Bradford County is vacated, and this matter is remanded to the trial court for proceedings consistent with this opinion.

Jurisdiction relinquished.

---

10. Based on the foregoing conclusions this Court need not address Craftmaster's remaining arguments concerning the thoroughness of the trial court's October 18, 2005, Rule 1925(a) Statement.