**In re Appeal of Council Rock School District v. Bucks County Board of Assessment**

64

C.P. of Bucks County, No. 2007-09906-26-6.

*Robert M. Cox,* for plaintiff.
*Edward Rudolph, Mark S. Cappuccio* and *Anthony R. Thompson,* for defendant.

MELLON, *J.,* February 11, 2013—Appellant, Council Rock School District ("Council Rock") instituted this appeal on May 4, 2007, by filing a petition to challenge the 2008 through 2013 assessment values for Tax Parcel Number 29-010-075-004, a commercial property ("Property") located at 100 Campus Drive in Newtown Township, Bucks County, Pennsylvania, owned by Appellee-Intervenor LMC Properties, Inc. ("Lockheed").[1] On November 9, 2007, the board of assessment appeals of Bucks County, Pennsylvania, denied Council Rock's petition and reaffirmed the assessed value of the property in the amount of $4,020,000 for tax years 2008, 2009, and 2010; and $4,355,840 for tax years 2011, 2012, and 2013.[2] On November 28, 2007, Council Rock filed a notice of appeal by right to this court, pursuant to the Pennsylvania Consolidated County Assessment Law, 53 P.S. § 8854(a)(1). A non-jury trial commenced with a property view by the court on December 10, 2012. For the reasons discussed below, the court reverses the decision of the Bucks County

---

1. Council Rock's petition for appeal, Nov. 28, 2007.
2. *Id.*

Board of Assessment Appeals, and finds as follows:

1. The assessed value for 2008 is $5,862,948.

2. The assessed value for 2009 is $6,297,060.

3. The assessed value for 2010 is $5,724,261.

4. The assessed value for 2011 is $8,009,320.

5. The assessed value for 2012 is $8,303,240.

6. The assessed value for 2013 is $7,935,840.

FACTUAL AND PROCEDURAL BACKGROUND

The subject property is a 52.25-acre office, research and industrial center for Lockheed's Commercial Space Systems Division. It is located in southeastern Bucks County, immediately adjacent to the Interstate-95 transit corridor.[3] This appeal concerns tax years 2008 through 2013, thus the initial fair market valuation was developed in 2007.

As of August 1, 2007, the property included two buildings and significant open space, including wetlands area.[4] The first building, Building No. 350, also known as the "Project Support Building/PSB" and hereinafter "the office building," was constructed in 1974 and encompassed approximately 69,500 square feet in 2007,

---

3. Notes of trial testimony, hereinafter "N.T.," 12/10/2012, 23:18-23.
4. N.T., 12/10/2012, 24:17-20; Real estate appraisal report of Maureen Mastroieni, Oct. 18, 2007 (and amended July 26, 2011), on behalf of Council Rock School District (hereinafter "Council Rock Ex. 2"), at 1.

including the 1997 addition of a large cafeteria space.[5] The office building is a cantilevered concrete and steel beam box shape with executive offices on the lower floors and predominately flexible and cubicle-style office space throughout. The parties agree that the majority of this building is categorized as "Class B" office space, meaning it is not a brand new, state of the art facility, but still well-maintained and attractive to potential buyers.[6] The parties agree the building is in "good" physical condition.[7]

The second building, Building No. 351, also known as the "Project Team Building/PTB" and hereinafter "the R & D Building," was constructed in 1997, and in 2007 encompassed approximately 355,127 square feet of office, laboratory and manufacturing space.[8] Approximately 53% of the space is allocated to offices, less than 5% is laboratory space, and the remainder is manufacturing space or "high bay" loading areas.[9] Structurally, the R & D Building has a steel frame exterior with a total building height of 55 feet measured to the underside of the roof deck.[10] The office space in the R & D Building is similar to the office building, predominately flexible and cubicle space with private offices along the exterior walls.[11]

The R & D Building also includes laboratory and production space with clean rooms. Lockheed conducts acoustical and seismic testing in the manufacturing space

5. N.T., 12/10/2012, 35:4-14; *see* Council Rock Ex. 2, at 1.
6. N.T. 12/10/2012, 36:12-18; N.T., 12/11/2012, 105:18-23.
7. N.T., 12/10/2012, 35:15-16; N.T., 12/11/2012, 106:12-14.
8. N.T., 12/10/2012, 32:16-22.
9. N.T., 12/10/2012, 37:19-20; 38:23-25.
10. Council Rock Ex. 2, at 17.
11. N.T., 12/10/2012, 37.

of this building, related to the company's commercial space program. The parties agree that this building is in "excellent" or "very good" physical condition.[12]

A third building, the "Patriot Center," was constructed in 2010 to serve as conference, meeting and display space for the complex.[13] The Patriot Center was first included in the tax year 2011 Property valuation. The parties agree that this building is in "excellent" condition.[14]

In this appeal, Council Rock argues that the values found by the Bucks County Board of Assessment Appeals do not reflect the full fair market value of the Property and the buildings therein.[15] Council Rock claims the accurate fair market value of the property is nearly double the fair market value found by the Bucks County Board of Assessment Appeals. Council Rock argues that the fair market value should be based on the mix of a cost valuation[16] and a sales comparison valuation,[17] which Council Rock terms a "reconciled value."[18]

---

12. N.T., 12/10/2012, 38:9-39:16; N.T., 12/11/2012, 106:18-20.

13. Real estate appraisal report of Maureen Mastroieni as of January 1, 2009, hereinafter "Council Rock Ex. 3," at 26.

14. Real estate appraisal report of Maureen Mastroieni as of January 1, 2011, hereinafter "Council Rock Ex. 4," at 28; N.T., 12/11/2012, 106:22-23.

15. *See* N.T., 12/10/2012, 4:12.

16. Council Rock Ex. 2, at 36. ("The methodology of the cost approach involves estimating the value of the subject parcel of land, as if vacant, by the sales comparison approach. The replacement cost of the improvements is estimated then reduced by the amount of physical depreciation and functional and economic obsolescence in the property on the valuation date.")

17. Council Rock Ex. 2, at 42. ("The sales comparison approach is an opinion of value by comparing the subject property to similar properties that have sold recently... adjusted for terms of the sale... and for location and physical characteristics.")

18. N.T., 12/10/2012, 79:6-14.

As required by the consolidated county assessment law, the court must apply the common level ratio for each year to the fair market value for each year in order to arrive at the assessed value.[19] In this case, the parties have stipulated to the common level ratios.[20]

The court finds that the property has been undervalued by the Bucks County Board of Assessment Appeals. The court makes the following findings of fact regarding the credibility of the expert witnesses:

1. The testimony of real estate appraiser Maureen Mastroieni ("Mastroieni") that the cost valuation method is the appropriate method to calculate the fair market value of the Property is credible.

2. The calculation of Mastroieni that the fair market value for the property in initial tax year 2008 is $72,800,000, applying the cost method, is credible.

3. The testimony of real estate appraiser Steven Bott ("Bott") that the sales comparison method of valuation is appropriate to calculate the fair market value of the property is not credible.

4. The comparable properties Bott selected for his sales comparison calculations are not sufficiently similar to the subject property to form a credible sales comparison valuation.

---

19. 53 P.S. § 8842(a).
20. *See* N.T., 12/10/2012, 10:15-11-17. The common level ratios for the following tax years are: 2008:0.091; 2009:0.094; 2010:0.097; 2011:0.109; 2012:0.113; 2013:0.108.

5. The testimony explaining Mastroieni's reasoning for excluding functional and external obsolescence from her cost valuation calculations of fair market value is not credible.

6. The testimony of Bott that functional obsolescence and external obsolescence are appropriate factors in determining the property's fair market value is credible.

7. The calculations of Bott that functional obsolescence ranged from 15% to 20%, and that external obsolescence depressed the value of the property 5% from in tax years 2009 and 2009, and another 5% in tax year 2010, are credible.

8. The testimony of real estate appraisers Michael Samuels and Paul Griffith was superfluous to this matter.

Therefore, the court's determination reflects a fair market value based on cost method calculations offered by Mastroieni, less the deductions for functional and external obsolescence offered by Bott. The court finds the fair market values for the tax years under appeal are as follows:

1. Tax year 2008: $64,428,000.

2. Tax year 2009: $66,990,000.

3. Tax year 2010: $59,013,000.

4. Tax year 2011: $73,480,000.[21]

5. Tax year 2012: $73,480,000.

6. Tax year 2013: $73,480,000.

## DISCUSSION

In this appeal the court must determine the assessed value of the property for each year under appeal, based on the fair market value multiplied by the common level ratio.[22] The fair market value is: "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied."[23] In other words, the fair market value attempts to capture what the property would sell for on the date of the valuation, considering land, buildings and improvements.[24]

The court's fair market value determination must be based on the weight and credibility of the evidence offered by each party's appraiser.[25] The court must determine which method of property valuation it finds most credible:

21. N.T., 12/10/2012, 6:22-25. The parties stipulated that the court's market value determination for 2011 should prevail in 2012 and 2013.

22. 53 P.S. §8854(a)(2)(i); *see* N.T., 12/10/2012, 10:15-11-17.

23. *Grand Prix Harrisburg, LLC v. Dauphin Cnty. Bd. of Assessment Appeals*, 51 A.3d 275, 277 (Pa. Commw. Ct. 2012); *see* N.T., 12/10/2012, 20:14-21; N.T., 12/11/2012, 94:8-13.

24. *Buhl Found. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cnty.*, 180 A.2d 900, 902 (Pa. 1962); *Tech One Assoc. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cnty.*, 53 A.3d 685, 701 (Pa. 2012) (refusing to separate the property into a leased parcel and a non-leased parcel).

25. *Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 426 (Pa. 2001).

the cost approach, the sales comparison approach, or the income approach,[26] The court is not required to credit one expert completely to the exclusion of the other expert.[27] If both experts are equally credible, the court may find the fair market value lies between the values presented by each party.[28] The court may only consider the value of the land and buildings, not the machinery or equipment that is specific to the industry of the property owner.[29]

Procedurally, the initial burden falls on the county board of tax assessment to present a prima facie case that the tax is reasonable based on the tax card.[30] Here, the parties stipulated that the burden was satisfied.[31] The burden then shifts to Council Rock to present credible, relevant evidence from a qualified expert as to Council Rock's proposed valuation.[32] Then, Lockheed has an opportunity to rebut Council Rock's evidence.[33]

## I. THE COURT CREDITED COUNCIL ROCK'S TESTIMONY REGARDING THE COST VALUATION METHOD BECAUSE IT ACCURATELY CAPTURES THE MIXED-USE NATURE OF THE PROPERTY.

Council Rock urged the court to credit testimony based on the cost valuation method.[34] Lockheed urged the court to

---

26. *See Appeal of Avco Corp.*, 515 A.2d 335, 337-38 (Pa. Commw. Ct. 1986).
27. *Green*, 772 A.2d at 433.
28. *Id.*
29. 53 P.S. § 8811(b)(1); N.T., 12/10/2012, 111:3.
30. *Grand Prix Harrisburg*, 51 A.3d at 277.
31. *See* N.T., 12/10/2012, 9:13-19.
32. *Deitch Co. v. Bd. of Prop. Assessment of Allegheny Cnty.*, 209 A.2d 397, 402 (Pa. 1965).
33. *Id.*
34. N.T., 12/10/2012, 99:11-12.

credit testimony based on the sales comparison approach.[35] Neither party asked the court to consider the third approach identified in the statute, the income method, because all parties agree income calculation is only an appropriate valuation for income-producing or investment properties, and the subject property is owner-occupied.[36]

Based on the testimony presented, the appraisal reports submitted and the property view conducted, the court finds the cost method to be the most credible valuation of the property. The cost method is deemed credible and controlling because it most accurately captures the mixed-use aspects of this property, and best represents what value the property would sell for on the open market.

In addition to the cost and sales approaches, Council Rock's expert Mastroieni offered a third set of values for the property, which she developed by "reconciling" the cost approach values and her own sales approach values.[37] Because this "reconciled value" is not a standard industry approach, and because it is based on Mastroieni's personal judgment rather than a calculation of accepted values, the court does not find the reconciled values credible.

### A. Council Rock's Cost Valuation Method of Segmenting Building Types Is Permitted Under Pennsylvania Law.

The cost approach to valuation is defined by

35. N.T., 12/11/2012, 145:11-18.
36. 27 Summ. Pa. Jur. 2d Taxation § 15:10 (2d ed.); see N.T., 12/10/2012, 31:9-25.
37. *See* N.T., 12/10/2012, 79:16-20.

Pennsylvania statute as the "reproduction or replacement" cost of the property, "less depreciation and all forms of obsolescence."[38] The reproduction cost estimates the price to create an exact replica of the existing structures; the replacement cost estimates the price to recreate the buildings based on the generalized type of buildings and materials/finishes within.[39] Again, Pennsylvania law does not permit the court to consider the machinery and equipment that are specific to the property owners.[40]

Additionally, an appraiser developing a cost valuation may not consider any feature unique to the current user, whether an appliance or a modification of the building itself.[41] This improper approach is termed "value-in-use," and it is prohibited because it considers the value of the property as the current owner is using it, rather than the value of the property as viewed by a potential purchaser.[42]

Lockheed objects to Council Rock's separate value calculations for the office, laboratory and research space, arguing that such compartmentalization runs afoul of a rule against subdivision articulated in *Air Products & Chemicals, Inc. v. Board of Assessment* and *Craftmaster*

---

38. 53 P.S. § 8842(b)(iii)(A).

39. *See* N.T., 12/10/2012, 55:23-57:10; *F & M Schaeffer Brewing Co. v. Lehigh Cnty. Bd. of Appeals*, 610 A.2d 1, 5 n.3 (Pa. 1992) (replacement by generalized component is called the "unit-in-place" subtype of replacement cost methodology, and it is accepted in Pennsylvania).

40. 53 P.S. § 8811(b)(1).

41. *F & M Schaeffer Brewing Co.*, 610 A.2d at 4.

42. *F & M Schaeffer Brewing Co.*, 610 A.2d at 5. ("The objective of a cost valuation approach is to estimate, as closely as possible, the cost to construct new the existing taxable real estate because that is, after all, the subject of the assessment—not the production process or use of the property.")

*Manufacturing Inc. v. Board of Assessment.*[43] In *Air Products* and *Craftmaster*, the Commonwealth Court disallowed a valuation which treated a property as if it were legally subdivided into two parcels, separately owned, which together would be worth more than an undivided tract.[44]

An appraiser is permitted to value a property as it currently exists or in a reasonably foreseeable configuration (i.e., to value a shopping center as if the individual stores were leased to commercial tenants), but may not appraise a property speculatively, as if it were already rezoned and built upon.[45] The *Air Products* and *Craftmaster* cases are inapplicable to this matter, because neither Lockheed nor Council Rock presented testimony about a speculative future configuration of the property. Mastroieni's calculations comport with both the letter and the spirit of the *Air Products* and *Craftmaster* rule because she included only the existing property structures, not potential structures.

Calculating different values-per-square-foot for the office, laboratory and manufacturing areas logically captures the varying expense to create these spaces, which was established by testimony referencing real estate

---

43. 720 A.2d 790 (Pa. Commw. Ct. 1998); 903 A.2d 620 (Pa. Commw. Ct. 2006); *see* N.T., 12/12/2012, 233:1-5.

44. *See Air Products*, 720 A.2d at 794 ("the property may not be taxed as though it were currently subdivided and developed"); *Craftmaster*, 903 A.2d at 631 ("valuation of the parcels in that altered state was too speculative and it was legal error for the trial court to base its decision on that testimony.")

45. *Craftmaster*, 903 A.2d at 630. ("consideration of factors based on pure speculation... are irrelevant to the issue of fair market value.") (citation omitted).

standards. Here, the parties stipulated to the authority of the learned treatise the appraisal of real estate, 13th Edition.[46] Mastroieni then testified that the treatise requires an appraiser to estimate the contributory value of each type of use in a property where the highest and best use is a mixed use of building types.[47] Here, the parties agree that the current configuration of the property is the highest and best use, as a single parcel of mixed office, research and laboratory space.[48]

There has been no speculative testimony about future subdivision or buildings. While Lockheed, unlike Council Rock, considered the value of the company's permit to expand the existing buildings, this inclusion is allowable because the permit itself is an existing asset of the property.[49] It is then within the court's discretion to credit the testimony about the potential value a buyer would place on the expansion permit.

### B. Council Rock's Cost Valuation Calculations Appropriately Applied the Cost Methodology.

The court finds that Council Rock's cost calculations were credible, appropriately tailored to the multiple building types on the Property and, accurately reflect the Property's value to a potential buyer.

To derive a fair market valuation of the property under

---

46. N.T., 12/11/2012, 62:23-24.
47. N.T., 12/11/2012, 63:8-21.
48. N.T., 12/10/2012 30:3-4 (Mastroieni: "So in this case the highest and best use is what is there."); N.T., 12/11/2012 144:24-145:5 (Bott: "For continued use as office, testing and production facility").
49. *See Craftmaster*, 903 A.2d at 633.

the cost method, Mastroieni first calculated the value of the land based on Bucks County real estate data, and set it aside from the replacement calculations under the cost method valuation. The value of the land was $100,000 per acre, for a total value of $5,225,000.[50]

Under the replacement subtype of the cost valuation method, Mastroieni next calculated the approximate value per square foot of each building. Mastroieni calculated that the value of the office building was $175.59 per square foot. This price was based on guidelines from the Marshall & Swift cost valuation service.[51] The office building, inclusive of office, atrium and laboratory space in 2007, totaled 69,500 square feet, for a subtotal building value of $12,203,500.[52]

The approximate value of the R & D Building was $233.28 per square foot, including 355,127 square feet of office, clean room laboratories, manufacturing and high bay space.[53] Mastroieni testified that she arrived at the R & D Building value per square foot calculations by adjusting between the two closest Marshall Swift equivalent building types, Class-S and Class-C, and applying that calculation to the building sub-types of office, laboratory and manufacturing space.[54] She also made upward adjustments for higher-quality HVAC systems and higher-

---

50. N.T., 12/10/2012, 52:2-53:221. Even under a cost replacement or reproduction model, the value of the land itself is calculated using comparable sales because land is neither replaceable nor reproducible.
51. N.T., 12/10/2012, 54:12-13.
52. N.T., 12/10/2012, 57:15-18; Council Rock Ex. 2, at 41.
53. Council Rock Ex. 2, at 41.
54. N.T., 12/11/2012, 21:12-22:4.

quality finishes in the lab rooms.[55] Clean room space was assigned a higher value per square foot due to the special finishes on the flooring, walls and ceiling, as well as special ventilation adaptions in the air handling system.[56] The R & D Building subtotal value for tax year 2008 was $79,294,300.[57] Mastroieni based subsequent tax year values on the above calculations, adjusted accordingly for the changing price of labor and materials.

The court finds Mastroieni's upward value adjustments for finish and upgrades in the R & D Building to be credible because the adjustments reflect the superior conditions observed during the property view. The adjustments are based upon values established by the Marshall Swift valuation service.[58] The court also finds credible Mastroieni's assertion that the condition of the office space in the R & D Building is "excellent" due to renovation and continual building improvements.[59] By contrast, the court does not find credible Bott's assertion that the building should be categorized as "good," the category below "excellent."[60]

Mastroieni's cost calculations appropriately disregarded the value of acoustic rooms, "vibration" floor slabs, special piping and heavy-duty chiller equipment, because those building modifications are excluded under the "value-in-

---

55. N.T., 12/11/2012, 21:2-22:10; 26:14-27:19; 30:6-9.
56. N.T., 12/11/2012, 35:24-25.
57. *Id.*
58. N.T., 12/10/2012.
59. N.T., 12/10/2012, 38:11-17.
60. Report of William Bott (hereinafter "Lockheed Ex. 9") at 30, "Physical Condition."

use" rule.[61]

After valuing the buildings, Mastroieni also assigned a value of $3,645,000, to site improvements, inclusive of parking lots, driveways, landscaping and other external features of the property.[62] The sum of the building subtotals, together with the land value and site improvements, is $95,142,800.

Finally, Mastroieni decreased the property subtotal by the amount of depreciation, as required by the consolidated county assessment law. Mastroieni testified that the depreciation value for the 30-year-old office building was 66.7%, and the depreciation value for the 10-year-old R & D Building was 22%.[63] No further reductions were made for functional obsolescence or external obsolescence.[64] Thus, the final fair market value under Council Rock's cost valuation analysis for the initial tax year, 2008, was $72,800,000.[65]

For the following tax year, 2009, Mastroieni's estimated value increased to 77,000,000.[66] The increase was largely attributable to the rising costs of construction.[67] In tax year 2010, the total estimated value fell to $71,100,000.[68] This was due to the falling cost of construction, which was affected by a weak economy and less construction activity

---

61. N.T., 12/10/2012, 56:9-57:4; N.T., 12/11/2012, 39:3-23.
62. N.T., 12/10/2012, 58:24-59:3.
63. N.T., 12/10/2012, 59:16-60:3.
64. N.T., 12/10/2012, 59:12-23.
65. N.T., 12/10/2012, 60:7-8.
66. Council Rock Ex. 3, at 55.
67. N.T., 12/10/2012, 93:11-15.
68. Council Rock Ex. 3, at 61.

overall.[69]

In tax year 2011, the value increased substantially to $83,500,000 due to the addition of the Patriot Center and an addition to the manufacturing space in the R & D Building.[70] A significant portion of the increase was due to the higher cost of construction on the manufacturing facility.[71]

The court found credible all of Mastroieni's above testimony regarding the cost valuation method. The court also found credible Mastroieni's testimony that the value of the permit to expand the facility is negligible to a potential buyer, given the local economy, the low demand for office space in the area, and the 16% commercial vacancy rate in Bucks County.[72]

### C. Lockheed's Sales Comparison Testimony Was Not Credible Due to the Dissimilarities Between the Comparables and the Subject Property.

The court did not find credible the testimony regarding the sales comparison approach because the properties selected by Lockheed's expert appraiser William Bott ("Bott") were not sufficiently similar to the subject property to provide a fair market value. Although the sales comparison approach is a permissible method of deriving fair market value, in this case, the eight allegedly comparable properties were dissimilar in geography,

---

69. N.T., 12/10/2012, 95:5-14.
70. N.T., 12/10/2012, 100:5-9; 102:12-13.
71. N.T., 12/10/2012, 104:5-106:14.
72. N.T., 12/10/2012, 43:25-44:21; 45:11-17.

financial situation, and the mix of building types on the property.

In order to find property sales "similar" to the subject property, Bott's review stretched from the Canada border south to the Mason-Dixon line, and eastward from the Mississippi River to the Atlantic Ocean. This area encompasses real estate markets vastly different from Bucks County, Pennsylvania, making it difficult if not impossible to compare values.

Even within this substantial area, however, the properties Bott selected were not similar to the subject property in building height, facility type, or financial situation at the time of sale. In order to compensate for the dissimilarity, Bott had to make gross accuracy adjustments ranging from 27.5% to 140%; half of the adjustments were 100% or greater.[73] Much of the adjustment was attributable to the differing mix of building types. Some of the properties did not have one of the three facility types on the subject property, and most had an abundance of lower-cost warehouse or production space.[74] Four of the eight sales offered were distressed sales, sale-leaseback agreements, or both, which are not comparable to an owner-occupied property.[75] In one instance, Bott made a downward adjustment to the price for a leaseback agreement. In another instance, Bott did not make a downward adjustment to the price for a leaseback agreement, demonstrating an

73. N.T., 12/12/2012, 10:16-18; 17:17-20; 22:22-25; 25:2-5; 32:14-18.
74. See id.
75. N.T., 12/12/2012, 9-32.

inconsistent and unreliable approach to valuation.[76]

Because the underlying data supporting the sales comparison approach is not reliable and not comparable to the subject property, this court does not find the sales comparison testimony credible.

## II. THE COURT FOUND CREDIBLE LOCKHEED'S TESTIMONY REGARDING THE FUNCTIONAL AND EXTERNAL OBSOLESCENCE BECAUSE THESE FACTORS AFFECT THE FAIR MARKET VALUE AND ARE REQUIRED UNDER THE COST VALUATION METHOD.

Under the cost valuation method set forth in the consolidated county assessment law, the court must consider "all forms of obsolescence."[77] Although Council Rock's cost valuation methodology was otherwise credible, Mastroieni failed to consider either functional or external obsolescence in her calculations.[78] Accordingly, the court incorporated the functional and external obsolescence values offered by Lockheed.

### A. Functional Obsolescence Calculations Apply to the Value of the Property.

Functional obsolescence is a downward adjustment on property value based on outmoded aspects of building design.[79] For example, on the property, the cantilevered

---

76. N.T., 12/12/2012, 20:9-17; 21:4-6.
77. 53 P.S. §8842(b)(1)(iii)(A).
78. N.T., 12/10/2012, 60:12-20 (testifying, "at this point in time neither functional nor external obsolescence are necessary").
79. *See, e.g.,* N.T., 12/12/2012, 148:7-10.

design of the office building, dating back to the 1970s, is now recognized as inefficient from a heating and cooling perspective.[80]

Mastroieni testified that she did not calculate functional obsolescence because she believed that these downward adjustments were encapsulated in her depreciation calculations.[81] This is incorrect, because the consolidated county assessment law indicates depreciation and obsolescence are separate calculations.[82]

By contrast, Bott testified that the property had a number of design factors that bear on functional obsolescence, both positive and negative, for a negative net effect on value.[83] Bott testified that the negative effect of functional obsolescence on the property value ranged from 9% to 12%.[84] Based on Bott's calculations, the court deducted 9% for tax year 2008 (deduction of $6,552,000); 10.5% for tax year 2009 (deduction of $8,085,000), and 12% for tax year 2010 and 2011 (deductions of $8,532,000 and $10,020,000, respectively).

### B. External Obsolescence Calculations Apply to the Value of the Property.

---

80. *See* N.T., 12/10/2012, 118:13-16; N.T., 12/11/2012, 43:1-5.
81. N.T., 12/11/2012, 42:16-25.
82. 53 P.S. §8842(b)(1)(iii)(A).
83. N.T., 12/11/2012, 120-125 (referencing Lockheed Ex. 9, at 30-32).
84. N.T., 12/11/2012, 126:1-14; 231:13-232:9. Bott testified that the overall decrease due to depreciation and obsolescence ranged from 60% to 65%, and that functional obsolescence ranged from 15% to 20% of the total decrease. Bott attributed 60% to 2008, a "slight increase" to 2009, and 65% to 2010 and again to 2011. Therefore, the court calculated the negative net effect of functional obsolescence on the Property value was 9% in 2008, 10.5% in 2009, and 12% in 2010 and 2011.

External obsolescence is a downward adjustment on property value based factors external to the property—in other words, market forces.[85] External obsolescence may also include an undesirable use of a neighboring property, or the market conditions of the buyer or owner's core business.[86]

As set forth above, the court is required to consider external obsolescence as a component of the cost valuation method.[87] Therefore, the court did not find credible Mastroieni's testimony that external obsolescence was "not necessary."[88] Moreover, Mastroieni acknowledged that a global market downturn at the end of 2008 had an impact on the U.S. manufacturing sector and led to depressed real estate prices, which would be reflected in external obsolescence calculations, had she incorporated them.[89]

Bott agreed that a global market downturn affected the manufacturing sector, weakening demand for real estate such as the subject property.[90] He testified that market forces initially depressed the value of the property 5%, applicable to tax years 2008 and 2009.[91] Bott testified that market forces then depressed the value of the Property another 5%, applicable to tax year 2010.[92] Therefore, the court deducted half of the first 5% from the 2008 value

---

85. N.T., 12/11/2012, 132:8-12.
86. N.T., 12/11/2012, 48:23-49:9.
87. 53 P.S. §8842(b)(1)(iii)(A).
88. N.T., 12/10/2012, 60:12-20.
89. *See* N.T., 12/10/2012, 45:1-3; 94:10-12; 96:14-18: 101:4.
90. N.T., 12/11/2012, 98:4-99:25; 100:15-101:13.
91. N.T., 12/11/2012, 104:2-7.
92. *Id.*

(deduction of $1,820,000), and half of the first 5% from the 2009 value (deduction of $1,925,000). Then the court deducted the second 5% from the 2010 value (deduction of $3,555,000).

The court then arrived at the final fair market values by summing the external and functional obsolescence values offered by Bott, and subtracting those sums from the cost valuation calculations offered by Mastroieni, which included depreciation. Therefore, the court's final fair market value calculations reflect the statutory definition of cost valuation method. Finally, the court arrived at the assessed value of the property by multiplying the cost valuation numbers by the stipulated common level ratios.

## CONCLUSION

The court concludes that Council Rock has shown by a preponderance of the evidence that the assessed values of the subject property established by the Bucks County board of assessment appeals are far below what is indicated under the applicable law. The court further concludes that the assessed values of the subject property are equal to the cost valuation figures introduced by Council Rock, less the functional and external obsolescence values introduced by Lockheed, as set forth in detail above.

Wherefore, it is the verdict of this court that the determination of the board of assessment appeals of Bucks County is reversed and the proper assessment value of the property is as follows:

7. The assessed value for 2008 is $5,862,948.

8. The assessed value for 2009 is $6,297,060.

9. The assessed value for 2010 is $5,724,261.

10. The assessed value for 2011 is $8,009,320.

11. The assessed value for 2012 is $8,303,240.

12. The assessed value for 2013 is $7,935,840.

Judgment to be entered accordingly.

## ORDER

And now, this 11th day of February, 2013, the court withdraws its opinion originally filed February 5, 2013, due to incorrect calculations in its final conclusion, and issues the following amended opinion.